E-FILED
Friday, 11 August, 2006  08:40:21 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

COMMONWEALTH INSURANCE COMPANY, )
                                      )
         Plaintiff,               )
                                        )
         v.                         )      Case No.  06-1060
                                        )                   06-1061
TITAN TIRE CORPORATION, et al.,    )                   06-1062
                                        )
         Defendants.        )

## O R D E R

This matter was before the Court on July 20, 2006, for a bench trial on remaining claims.  Upon consideration of the record, the Court's findings of fact and conclusions of law follow.

### Findings of Fact

1.      Titan entered into a written contract with Pirelli dated July 16, 1994, whereby Titan purchased certain assets of Pirelli, primarily consisting of Pirelli's tire manufacturing facility located in Des Moines, Iowa ("the Des Moines Facility").  The scope of this agreement did not include the sale or purchase of certain machinery and equipment located at the Des Moines Facility used by Pirelli in the manufacture and production of light truck tires ("LT Tires").

2.      In a separate written contract dated July 16, 1994, entitled "Manufacturing Agreement," Titan and Pirelli agreed that Titan would manufacture and produce for Pirelli at the Des Moines Facility LT Tires ordered by Pirelli, using Pirelli's LT tire machinery and equipment until such time as Pirelli removed the equipment.

3.      Section 6 of the July 16, 1994, Manufacturing Agreement provided:

>       Section 6.   Product Warranty; Product Claims.   Titan Tire
>       warrants that the LT Tires manufactured and produced
>       hereunder shall (a) conform strictly to the Specifications; (b) be
>       new, unused and free from defects in material and
>       workmanship.  Titan Tire shall mark all LT Tires manufactured
>       and produced by Titan Tire hereunder so as to distinguish the
>       same from any other products which Pirelli Armstrong has
>       hereto fore or after the date hereof manufactured, produced or
>       sold.   Titan Tire shall indemnify and reimburse Pirelli
>       Armstrong for any and all costs and expenses which it shall
>       incur due to defects in the LT Tires due to failure of the LT
>       Tires to conform to the Specifications and/or due to defects in
>       material or workmanship.  These costs and expenses shall
>       include but not be limited to the costs of replacing or repairing
>       the defective LT Tires, and any other costs (including closts of
>       recalls due to defect in LT Tires and all costs and expenses
>       including, without limitation, defense costs and reasonable
>       attorneys fees and expenses) arising out of claims for product
>       liability on the basis fo the defective products, including
>       settlement of any such claims) and expenses, if any,
>       associated with such defects.  Notice with respect to any
>       claims made pursuant to this Section shall be sent in writing to
>       Titan Tire promptly after the defect in the LT Tires or any
>       claims arising from such defect become known to Pirelli
>       Armstrong.  Pirelli Armstrong shall not settle any such claims
>       without the consent of Titan Tire, which shall not be
>       unreasonably withheld or delayed.  Notwithstanding the above,
>       in no event shall Titan Tire be liable for any incidental, special
>       or consequential damages or any other relief not expressly
>       provided for herein.

4.      Section 4 of the Manufacturing Agreement provided that "[t]he LT Tires shall be

labeled and identified by Titan Tire as specified from time to time by Pirelli

Armstrong."

5.      In early September 1994, Titan began manufacturing LT Tires and did so until early

1998, with the exception of a short period of approximately six (6) weeks in

November and December, 1994.  The size and model of the tire involved here, an

LT 235/85 R16, was manufactured by Pirelli beginning in December 1993 through

- 2 -

July 16, 1994, when Pirelli turned over the Des Moines plant to Titan.  Titan then manufactured the LT 235/85 R16 through the end of 1997.

6.    On January 16, 1996, Titan and Pirelli entered into another contract entitled "Titan/P.A.T.C. Agreement," which contained the following provision:

> 15.  PRODUCT INDEMNITY - Titan agrees to defend, hold harmless and indemnify PATC, its subsidiaries and affiliates, their officers, directors, employees, and agents from and against any and all claims for death, personal injury, property damage and all other damages, losses, claims, or suits, including costs and attorneys' fees, arising from any act or omission of Titan relating to defective material or workmanship except for any defective material supplied by PATC to Titan.
>
> PATC agrees to defend, hold harmless and indemnify, Titan, its subsidiaries and affiliates, their officers, directors, employees, and agents from and against any and all claims for death, personal injury, property damage and all other damages, losses, claims, or suits, including costs and attorneys' fees, arising from any act or omission of PATC relating to defective material supplied by PATC and for any defective design and/or specifications requirements of PATC.

7.    On or about August 20, 1998, a tragic automobile accident occurred in Duval County, Texas, in which eight people were killed.  As a result of that accident ("Accident"), numerous plaintiffs brought suit against Titan and Pirelli, among others (hereinafter referred to as "the Ramirez Action.")

8.    The plaintiffs in the Ramirez Action sought damages against Pirelli and Titan on theories including common law negligence based on the negligent design, manufacture, marketing and sale of a certain LT Tire, and strict liability theories based upon an alleged unreasonably dangerous condition of a certain LT Tire.

9.    On February 19, 1999, Pirelli requested that Titan defend, indemnify, and hold Pirelli harmless from the claims brought in the Ramirez Action.

10.    On February 22, 1999, and at all times thereafter, Titan refused to indemnify and hold Pirelli harmless for any defense costs and fees incurred in the Ramirez Action.

11.    Originally, the plaintiffs in the Ramirez Action contended that the LT Tire was manufactured by Pirelli.  Subsequently, the plaintiffs in the Ramirez Action contended that the LT Tire was manufactured by Titan at the Des Moines Facility, and Pirelli was dismissed from the litigation.  However, Titan then brought a counter-claim against Pirelli, and Pirelli continued to defend on the counter-claim.

12.    By no later than October 1, 1999, all theories of recovery related to negligent design were dismissed by all of the Ramirez Action plaintiffs against all the defendants.

13.    By April 2000, Commonwealth Insurance Company had paid its $30,000,000.00 total limit of liability under Titan's policies as part of the overall settlement of the Ramirez Action.

14.    As of April 2000, Pirelli had incurred $423,483.83 in defense fees and costs in the Ramirez Action.

15.    The LT Tire involved in the Ramirez Action was an LT 235/85 R16 tire, manufactured by Titan at the Des Moines Facility, as previously admitted by Titan during the prior stages of this litigation.

16.    The LT Tire involved in the accident failed and contributed to the cause of the accident.

17.    The experts retained by Titan and Pirelli in the Ramirez Action each examined the remnants of the accident tire and concluded that it was not defective.

18.    In the Ramirez Action, Pirelli also admitted that it had no direct or circumstantial evidence that the tire in question was defective.

19.   The experts retained by Titan and Pirelli in the Ramirez Action each examined the remnants of the accident tire and concluded that there was no manufacturing defect in the accident tire that caused it to fail.

20.   In the Ramirez Action, Pirelli also admitted, as part of the pretrial process, that it had no direct or circumstantial evidence that there was a manufacturing defect in the tire.

21.   The testimony of Pirelli's expert, Robert Ochs ("Ochs"), in this case is inconsistent with and contrary to the conclusions of Pirelli's own experts and its admissions in the Ramirez Action.

22.   Pirelli has presented no explanation for abandoning the opinions of its own experts in the Ramirez Action and adopting the opinions of Ochs, who was retained by the plaintiffs in the Ramirez Action.

23.   Pirelli has presented no explanation for abandoning its prior admissions on the issues of defect and causation.

24.   Upon examination of the remnants of the accident tire, there is a slight inward depression or distortion in the radial body cords that is indicative of something pressing down on them from the outside of the tire.

25.   Based on the existence of this depression, it is more likely that the hole in the accident tire resulted from localized trauma, such as a stone becoming lodged in the tire and slowly burrowing or "drilling" down into the tire, rather than resulting from a manufacturing defect working from the inside out as suggested by Ochs.

26.   It is also more likely that, with continued operation, the stone drilled its way through the components of the tire, creating a pathway for air to move into the structure of the tire, causing a degradation of the components and ultimately, their detachment.

27.    Accordingly, the Court finds the testimony of Titan's expert, Tom Dodson ("Dodson") to be more consistent with the factual record in this case and therefore awards his testimony greater weight.

28.    There was also testimony regarding a speck of foreign material inside the tire, which was referred to by the experts as either a wood chip or a piece of polyester.

29.    The record before the Court does not establish by a preponderance of the evidence that this speck of foreign material contributed to the failure of the LT Tire involved.

30.    The remnants of the LT Tire involved in the accident still had an "E-3" number visible.

31.    Unlike the DOT number, the E-3 number does not definitively establish the date upon which the tire was manufactured.

32.    The 35KO90 molds contained E-3 numbers upon their arrival at the Des Moines plant in late 1993 and 1994.

33.    Pirelli has not met its burden of proving that the LT Tire involved in the accident was manufactured after December 14, 1994.

34.    The failure of the LT Tire involved in the accident was not caused by a center-line tread separation.

35.    The failure of the LT Tire involved in the accident was not caused by undercuring. Both Ochs and Dodson agree that there is no evidence that the accident tire was undercured.

36.    Pirelli has not met its burden of proving that the LT Tire involved in the accident was not manufactured according to Pirelli specifications.

37.    Pirelli has not met its burden of proving the existence of a manufacturing defect which caused the failure of the LT Tire involved in the accident.

**Conclusions of Law**

1.  Titan is not obligated to indemnify Pirelli for attorneys's fees and expenses incurred in its defense of the Ramirez Action, because Pirelli has failed to sustain its burden of proof in that Pirelli has not established the following by a preponderance of the evidence:

    a.  That the accident tire was manufactured after December 14, 1994;

    b.  That the accident tire had a manufacturing defect;

    c.  That the accident tire did not conform to Pirelli's specifications or practices followed at the Des Moines plant;

    d.  That a manufacturing defect in the accident tire was a cause of the failure of the tire; and

    e.  That Titan breached its agreements to indemnify Pirelli.

2.  Titan is entitled to Judgment in its favor on all remaining claims.

**Discussion**

The Court first notes that some things are not in dispute in this case, the most important of which is the fact that there was a terrible tragedy resulting in death that involved an LT Tire that was made at the Des Moines plant.  That being said, the two central issues are hotly contested.

With respect to the key question of the date of manufacture of the accident tire, the record contained conflicting evidence.  Pirelli presented the deposition testimony of James Illingsworth ("Illingsworth") that he worked in the mold shop at the Des Moines plant during the relevant time and recalled the E-3 numbers being added to the 35KO90 molds some time in the fall of 1996.  The Court found Illingsworth to be generally credible, and standing

alone, his testimony would have been compelling evidence.  However, his testimony is not the only evidence of record on this issue.

Pirelli also offered a stamping drawing for the LT 235/85 R16 tire and three other kinds of tires that shows a revision to the molds to add E-3 numbers in September 1996. However, this exhibit is somewhat ambiguous because the stamping drawing contained information for four different tires, and the revision did not specify which of the four tires were to receive the change.  While testimony from the individual who actually made the changes in the molds in September 1996, a statement from the draftsman who initiated the change, prior versions of the stamping drawings, or other internal documents detailing the change could have been presented in order to clarify whether this revision to add the E-3 number in 1996 applied to the 35KO90 molds, no such evidence was presented.  In fact, both sides indicated that any such evidence no longer exists.

On the other hand, Titan presented the live testimony of Keith Hupp ("Hupp"), the mold inspector in the Quality Control Department at the Des Moines plant at the relevant time.  Hupp inspected the molds as they arrived and compared them to the stamping drawings.  He explained his habits and practices in detail, including the fact that all of the pencil notations in the upper portion of the mold inspection forms were made by him at the time that he inspected the molds, shortly after they were received and before they were released for use in production.  Hupp testified that it was his practice to note, date, and initial any subsequent changes to the molds in the comments section on the bottom of the form rather than in the upper portion.  As the notations regarding the E-3 numbers on the mold inspection reports in evidence are located in the top portion of the forms rather than the comments section at the bottom of the form, Hupp's testimony that he noted the E-3

numbers during his initial inspections in 1993 and 1994 is consistent with his standard habits and practices.

Although there was some evidence indicating that the E-3 numbers first appeared on the 35KO90 molds in the fall of 1996, the Court finds Hupp's testimony that the E-3 numbers were present in the molds when they arrived at the Des Moines plant beginning in late 1993 and continuing through early 1994 to be more credible and entitled to greater weight. His testimony is supported by contemporaneous written documentation and is consistent with his common practices. There is nothing illogical or counter-intuitive about his explanation for the revision on the stamping drawing. Hupp's testimony was not significantly impeached or rebutted, and there is no indication that the numbers were added into the inspection reports at some later date. Moreover, when asked if he would be able to refute Hupp's testimony that the molds had the E-3 numbers on them when they arrived, Illingsworth conceded that he could not refute such testimony. Accordingly, the Court must conclude that Pirelli has failed to demonstrate that the accident tire was manufactured after December 14, 1994, by a preponderance of the evidence.

The other key issue in this case was whether there was a manufacturing defect or non-conformity in the accident tire. Pirelli attempted in part to establish that the accident tire was defective through the testimony of the striking tire workers. Robert Janes, James Pickering, William McLoughlin, and James Illingsworth were employed in the Des Moines plant and testified that there were some questionable safety/inspection practices at the time that Titan took over operations. Each of these tire workers also opined that he could tell

from the remnants of the accident tire that the tire was "undercured" in the production process and should not have passed quality inspection.  These lay opinions are flatly contradicted by the opinions of the retained experts, both of whom concur that there is no visible sign of undercuring on the accident tire.   Moreover, with all due respect, the effort to use the tire workers' testimony to suggest that the inspection process had regressed to the point where defective tires were routinely released is unavailing.  The tire workers admitted that to their knowledge, no tires were allowed to leave the plan in an unsafe condition, and the Court could not conclude that any deficiency in safety/inspection practices resulted in a defective tire being released in this case without resorting to rank speculation.

Pirelli also attempted to distance itself from the admissions that it made and the opinions of its retained experts in the Ramirez Action.  The only attempted explanation for this is the suggestion of a Pirelli attorney during the trial testimony of John Bush, who had been one of Titan's counsel in the underlying case, that Pirelli "was in a Catch 22 situation" when it made its admissions because admitting that the tire was defective in the underlying case would have exposed Pirelli to liability in the event that Titan had been able to prove that Pirelli had manufactured the tire.  While this may be an accurate assessment of the realities of situation, the Court should not be expected to ignore the fact that a party has made an admission in litigation and then made a 180 degree change in that position to a categorical denial of that admission.  Pirelli should have some realization that a subsequent trier of fact may take that change into consideration.  The fact that the Seventh Circuit found that Pirelli was not estopped from changing its position does not mean that the prior position

is not relevant or should not be considered as an admission in weighing the evidence in this case.

That leaves the expert testimony. Pirelli presented the video testimony of Ochs, and Titan offered the video testimony of Tom Dodson ("Dodson"). Each expert stated logical, reasonable explanations for their opinions, and the Court found their testimony to be very close to a draw. That being said, upon examining the remnants of the tire following the conclusion of the trial, the Court was able to observe and feel a slight depression or inward distortion of the radial body cords, which was discussed by Dodson while effectively ignored by Ochs. The Court finds the depression to be more consistent with Dodson's opinion that a rock or other foreign object had pressed inward from the outside surface of the tire and gradually wore away the tire's carcass to cause internal deterioration than it is with Ochs' explanation that a leaky bladder caused an air pocket within the interior of the tire at the time of manufacture that worked its way outward, resulting in a blow hole in the tread. This, in combination with Pirelli's admissions in the Ramirez Action, tip the balance in Titan's favor on the question of whether there was a manufacturing defect in the accident tire.

Finally, the Court notes that there are a number of documents that testimony indicated were routinely made and kept in the normal course of business at both Titan and Pirelli that are conspicuously absent in this case. It stretches credulity to believe that all of these documents were accidentally thrown away or lost, but it is impossible to determine where to start assigning blame. The failure of both parties to preserve these documents so that they could be part of the record at trial is distressing on several levels and leaves a large evidentiary void in the proof of this case.

- 11 -

**<u>Conclusion</u>**

For the reasons set forth above, the Court finds that Pirelli has not met its burden of establishing Titan's liability for breach of the indemnity agreement in this case. Accordingly, the Clerk is directed to enter Judgment in favor of Titan and against Pirelli. This matter is now TERMINATED.

ENTERED this 10th day of August, 2006.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge

- 12 -